# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01055-COA

**TRAVIS C. CAMPBELL A/K/A TRAVIS CONTZ**          **APPELLANT**
**CAMPBELL A/K/A TRAVIS CORTEZ**
**CAMPBELL A/K/A TRAVIS CONTEZ**
**CAMPBELL**

**v.**

**STATE OF MISSISSIPPI**          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/29/2022 |
| TRIAL JUDGE: | HON. ROBERT THOMAS BAILEY |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JAMES HOWARD MURPHY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAUREN GABRIELLE CANTRELL |
| DISTRICT ATTORNEY: | KASSIE COLEMAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/13/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McCARTY AND EMFINGER, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1. After smashing the back door of a woman's house, a man was arrested following a lengthy foot chase with law enforcement. He was charged with burglary of a dwelling and found guilty after a jury trial. On appeal, he claims there were errors with the weight and sufficiency of the evidence, that improper information was given to the jury, and that the State allegedly committed an evidentiary violation as well as a violation in the selection of jurors. Finding no error, we affirm.

## FACTS

¶2.    While on his front porch one evening, Wayne Goodman observed a man in a "white cap and a light shirt" washing his neighbor's windows with a "mop-type thing." Goodman called his neighbor, Joni Thrailkill, and asked her if she had somebody washing her windows. Thrailkill told Goodman no and to call 911, which he did.

¶3.    While on the phone with dispatch, Goodman "realized" that the man "wasn't washing the windows, he was trying to break in." Goodman would later testify that when the man "didn't make any progress on the window," he watched the man "reach[] over and snatch[] the glass door open . . . back[] up about eight to ten feet and smash[] the inside door."

¶4.    After he got off the phone with dispatch, Goodman walked across the street past Thrailkill's house, looked down another street nearby, and saw the man "running with a TV under his arm." Around that same time, officers arrived on scene, and Goodman pointed in the man's direction and said, "[T]here he goes down the street with a TV under his arm."

¶5.    A lengthy foot chase ensued between the man and Officer Jeremey McDonald of the Meridian Police Department, which was documented on his body camera. Officer McDonald eventually caught up to the man, and after a short scuffle, he placed the suspect under arrest. Another officer arrived on scene shortly after and found a TV remote in the man's pocket. The suspect was then identified as Travis Campbell. Campbell was indicted for burglary of a dwelling.

**PROCEDURAL BACKGROUND**

¶6.    During pretrial motions, the Defense argued a motion to dismiss based on an alleged *Brady* violation. The crux of Campbell's motion was essentially that the Meridian Police

2

Department "through a series of actions on their part . . . made [fingerprint] evidence unavailable and that the evidence would be exculpatory toward the defendant should it be located and used in the case[.]"

¶7.     In response, the State emphasized a defendant "must show that there was exculpatory value in the item that they are referring to and that the exculpatory value is apparent before the evidence was destroyed or lost." Simply claiming such evidence "may be exculpatory" or "could be exculpatory" does not satisfy that burden, the State argued. The State further argued the Defense was required to show "bad faith on the part of the State or the police" as opposed to "negligently losing" the evidence.

¶8.     Equally unconvinced by the Defense's argument, the trial court denied the motion to dismiss "for failure to prove that the evidence is exculpatory or . . . it was lost due to bad faith on the part of the police department[.]"

*Voir Dire and Jury Selection*

¶9.     Prior to voir dire, the trial court addressed a few housekeeping matters before the jury venire. The trial court first emphasized that a grand jury proceeding presents "only one side of the case . . . from the State's perspective." Further informing the jury venire that "Mr. Campbell [was] not able to be there," nor were any "witnesses that could be favorable to the defendant[,]" the trial court made clear:

> [A]n indictment does not mean guilty. It does not mean not guilty. The only
> person that can determine guilty or not guilty is the jury, and that's what y'all
> will be here for today. You only determine guilty or not guilty after hearing
> all the evidence and testimony that's put before you today and tomorrow. . . .
> Just because someone is indicted does not mean they are guilty. I just want to
> make sure that's clear[.]

3

The trial court then began its voir dire examinations, followed by the State and then the Defense.

¶10. Selection of the jury took place in the judge's chambers. On its own initiative, the trial court first went through each juror it challenged for cause. With no objection from either side, each of the mentioned jurors were struck for cause. Next, the State and Defense took turns offering additional jurors they wished to challenge for cause. After the jury was selected, the following exchange occurred:

| | |
|---|---|
| The Defense: | Your Honor, would it be proper at this time to make a *Batson* challenge on this? |
| The Court: | Well, you can ask. |
| The Defense: | Well, Your Honor, our contention is that every black juror has been struck off the jury and there is no people of color selected at all. |

The State then went through each of its strikes, offering a race-neutral purpose for striking each of the jurors.

| | |
|---|---|
| The Court: | The State had provided race-neutral reasons for striking – for all their strikes. Which with that response, I mean, I'm not sure, other than – |
| The Defense: | Just a ruling, Your Honor. We have no response to that. |
| The Court: | Okay. All right. So I want to overrule the *Batson* objection on the record. |

*The Trial*

¶11. The State called four witnesses at trial: the neighbor, the victim, and two officers who were on the scene on the night of the incident. Goodman's testimony focused largely around

4

his observations of Campbell breaking into the victim's home and his subsequent on-scene interactions with law enforcement after reporting the incident.

¶12. Next, the jury heard from Michael Allen, a patrol officer with the Meridian Police Department at the time of the incident. Officer Allen testified that he "responded to a burglary call" and "noticed that the front door was locked but the back door had been broken open." He explained to the jury that he and another officer "went inside the residence and cleared it" to make sure another "human wasn't inside the house." While clearing the house, he testified that he noticed items scattered about the floor that appeared out of place.

¶13. About "four to five minutes later," Officer Allen spoke with Ms. Thrailkill and asked her if her residence "look[ed] that way when she left," and she said no. The pair then walked through Ms. Thrailkill's house while she pointed out the items that were missing. Among the missing items were "a TV; a bag in her room that had some coins, valuables in it; and some swimsuits[.]" When asked what he did after the walk-through with Ms. Thrailkill, Officer Allen testified he "relayed [the information] over the radio to let the officers in the area know what to be looking out for." He then identified Campbell in the courtroom.

¶14. The State then called Ms. Thrailkill. She recounted to the jury the call she received from her neighbor about a man "at my house washing windows." After being informed somebody had broken in, she went home. She testified that once she arrived, she noticed "glass everywhere . . . a lot of glass." She further testified that upon her arrival, officers asked her to check each room in her home to identify what items, if any, were missing. Ms. Thrailkill told the jury the missing items she identified to officers at the time was "the TV

5

and a remote, my Dillard's bag, and all my coins[.]"

¶15.   After being shown a picture of a remote, Ms. Thrailkill identified it as "a Samsung remote to my TV." When asked about the size of the stolen TV, Ms. Thrailkill stated that the TV was not heavy and that she had "picked it up and taken it off [her] dresser many times." She disclosed that all items stolen from her house were returned to her that same night by officers, including the remote to her TV.

¶16.   Lastly, the State called Jeremey McDonald, an officer with the Meridian Police Department at the time of the incident. Officer McDonald explained to the jury that he worked with the department's gang unit at the time and that the unit would "help investigation with their major crimes" and "help out with patrol." He recounted how, on the day of the incident, a burglary call came in around 7 p.m. He explained to the jury that when he arrived on scene 20 minutes later, he "walked around [the house] to see if [he] could find the suspect." During that time, Officer McDonald "saw the neighbor," who described Campbell and what he was wearing: "a white hat, white shirt, blue jeans, and some loud-colored shoes."

¶17.   Officer McDonald testified that while scanning the surrounding area, he "saw the suspect matching [the] description" he had just been given. He disclosed that he and Campbell made eye contact, and then Campbell "took off" and "jumped the fence" nearby. Officer McDonald "chased him . . . about three blocks" until he finally made contact. He testified that there was a brief scuffle between them until another officer arrived and helped him place Campbell into custody. He added that during this time, the second officer searched

6

Campbell and "pulled the remote out of his pocket." Before stepping down as a witness, Officer McDonald identified Campbell in the courtroom.

¶18. After the State rested its case-in-chief, the Defense moved for a directed verdict, alleging that the State failed to provide a prima facie case of burglary. Finding the State had "presented sufficient evidence to overcome the motion for directed verdict," the trial court denied the motion.

¶19. The Defense proceeded with its case-in-chief and called three witnesses. First, the Defense re-called Ms. Thrailkill's neighbor, Goodman, who gave a description of what Campbell was wearing on the night of the incident. When asked if he told the officer about Campbell's shoes, Goodman responded that he did not.

¶20. Next, the jury heard from Rochester Anderson, a corporal with the Meridian Police Department who also responded to the scene. Corporal Anderson testified that at the time of the incident he was a detective with the department. He explained to the jury that his duty as a detective was to "process the scene," which "involve[d] looking for any type of evidence that may exist: video footage, fingerprints, articles of clothing, gloves, anything that could say that a crime ha[d] been committed."

¶21. Corporal Anderson explained the department's procedure for collecting evidence to the jury. He testified that once fingerprints are lifted, they are placed on a card that is then submitted by the case detective into evidence at the station or sent to the crime lab, if requested. Corporal Anderson stated he "did fingerprints" after observing that items within the home had been disturbed. He testified that "a flat screen . . . had some hard prints on it"

7

that he was able to lift off the surface for collection purposes.

¶22.    When asked what he did with the lifted fingerprints, the following exchange occurred:

C. Anderson:       After we left the scene . . . I really can't remember.  I can't remember.

The Defense:       Has the police department been able to locate those fingerprints since then?

C. Anderson:       I have not talked to anybody to find out if they have or haven't, so I don't –

The Defense:       Were they examined by the lab?

C. Anderson:       I don't know, sir.

The Defense:       Have you been asked about the evidence since then, about where it is at?

C. Anderson:       Yes, sir.  Yes, sir.

The Defense:       And do you know where the fingerprints are?

C. Anderson:       No, sir.

. . . .

The Defense:       . . . Are the fingerprints missing or lost?

C. Anderson:       From the way you are asking, I can assume they are, yes, sir.

¶23.    The Defense recalled their last witness, Officer McDonald.  He was first asked to read his narrative report from the incident to the jury, which largely recounted what he previously testified to during his direct examination by the State.   When asked whether Officer McDonald could have been mistaken as to the neighbor's description of Campbell, specifically as it related to the "loud-colored shoes," Officer McDonald said no.

8

¶24. The jury found Campbell guilty of burglary of a dwelling. The trial court sentenced Campbell as a violent habitual offender to life imprisonment in the custody of the Mississippi Department of Corrections. Campbell moved for a judgment notwithstanding the verdict, or in the alternative, a new trial, which the trial court denied. Aggrieved, Campbell appealed.

## DISCUSSION

### I. The verdict was not against the overwhelming weight of the evidence, nor was the evidence insufficient.

¶25. Campbell argues that the jury's verdict was against the overwhelming weight of the evidence. Specifically, he contends that "all of the State's evidence was conflicting and each essential witness had testimony that was substantially and materially different from other essential witnesses." To some extent, Campbell also claims the evidence was insufficient to support his conviction. We address the weight of the evidence challenge first.

¶26. "Our role as [an] appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.* We "review the grant or denial of a motion for new trial for an abuse of discretion." *Owens v. State*, 383 So. 3d 305, 309 (¶19) (Miss. 2024).

¶27. Through counsel, Campbell points to two instances in which he believes "crucial aspects of the witnesses' testimony were directly and materially contradictory," therefore making his guilty verdict against the overwhelming weight of the evidence. First, Campbell

9

places great emphasis on the conflicting testimony from Goodman and Officer McDonald regarding the "loud-colored shoes." Goodman testified that he made no mention of shoes when describing Campbell to Officer McDonald. Conversely, Officer McDonald testified that Goodman's description of Campbell included a mention of "loud-colored shoes."

¶28. But this does not require reversal. This Court has held that it is the jury who "has the duty to determine the impeachment value of inconsistencies or contradictions as well as testimonial defects of perception, memory and sincerity." *Moore v. State*, 773 So. 2d 984 (¶8) (Miss. Ct. App. 2000). The jury was empowered to resolve any and all inconsistencies or contradictions that arose between witnesses during trial. Here, the jury resolved the conflicting testimony regarding the "loud-colored shoes," and it is not the duty of this Court to reweigh that decision.

¶29. The next instance Campbell points to involves conflicting testimony surrounding the stolen TV's remote. During trial, Officer McDonald testified that after Campbell was placed in custody, he witnessed the second officer who arrived on scene to help him "pull[] the remote out of [Campbell's] pocket." And as the State points out in its brief, as well as during its oral argument, Officer McDonald's body-cam footage "shows Detective Peters searching Campbell's pockets and Detective Peters holding a remote afterward." Lastly, at trial, Ms. Thrailkill also identified the TV remote as her own and testified that officers returned it to her on the night of the incident.

¶30. In his brief, Campbell states that "[w]hether the remote was actually found on [him is] a contested issue," arguing this requires reversal. But it is not contested before *this* Court;

10

it was contested in the *trial* court. And it is well-settled that "[w]hen there is conflicting or inconsistent testimony, 'the jury is the final arbiter of a witness's credibility.'" *Lott v. State*, 305 So. 3d 432, 435 (¶10) (Miss. Ct. App. 2020) (quoting *Robinson v. State*, 227 So. 3d 423, 426 (¶14) (Miss. Ct. App. 2017)). As "final arbiter of a witness's credibility," the jury was vested with the authority to resolve contested issues of fact. Bound as we are "to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice," we find no abuse of discretion.

¶31. Likewise, we find no merit to Campbell's claim there was insufficient evidence. In reviewing the sufficiency of the evidence on appeal, "we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Bishop v. State*, 282 So. 3d 633, 640 (¶26) (Miss. Ct. App. 2019) (quoting *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017)). "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements[;] rather, we must decide whether a reasonable juror could rationally say that the State did." *Id.* (citation omitted).

¶32. Therefore, we must determine if a reasonable juror could rationally find that Campbell committed the requisite elements of burglary of a dwelling. "The elements proving the offense of burglary are a breaking and entering of a building with the intent to commit a crime after entering." *Sykes v. State*, 749 So. 2d 239, 242 (¶5) (Miss. Ct. App. 1999). The jury heard from the victim's neighbor that he saw Campbell smash in the back door to Ms.

11

Thrailkill's home. He also testified he saw Campbell running down the street with a TV under his arm. The victim testified that items were missing from her home, and officers found Campbell in possession of the remote from a Samsung TV after a foot chase in the neighborhood. This issue lacks merit.

## II. The trial court did not err by referencing the grand jury proceedings.

¶33. Campbell next argues that "the trial court committed plain error when it made statements to the venire that would lead a reasonable juror to conclude that the defendant had already been found guilty." Through counsel, he attempts to frame the trial court's basic statements to the venire as somehow provoking error.

¶34. "[I]t has been held by the Mississippi Supreme Court that the jury must be informed of the precise charge against the accused, and providing such information is a duty of the trial court." *Taylor v. State*, 90 So. 3d 97, 112 (¶66) (Miss. Ct. App. 2011). In that case, the trial court "allowed the indictment to be read to the venire" and also "instructed the venire on the grand-jury process." *Id.* at 111 (¶64). Taylor alleged it was error to do so, but we found the argument was procedurally barred as it was not supported by caselaw and likewise did not acknowledge precedent. *Id.* at (¶65).

¶35. Indeed, longstanding precedent holds that "it is necessary that the jury be informed of the charge against the accused," and "it is the duty of the judge to see that the jury is informed of the precise charge against the accused and to do so may read the indictment to the jury." *Wood v. State*, 275 So. 2d 87, 89 (Miss. 1973); *see also* MRCrP 19.1(a)(1) (providing that at the outset of trial a "summary of the charge and the plea of the defendant

12

may be provided by the court").

¶36.    First, Campbell does not acknowledge or distinguish this precedent in any way.  Upon this fact alone, his assignment of error fails.

¶37.    But there is also a second reason we reject it.  Of concern is that appellate counsel for Campbell repeatedly urged this Court to find error based upon a characterization that the trial court essentially poisoned the jury by reading Campbell's indictment to it.  Counsel for Campbell frames this issue by claiming "the court's erroneous and clearly prejudicial remarks" indicated "that the grand jury had found that Campbell had committed the charged crime."  He further argued that "[t]he trial court did not explain that a grand jury only hears one side of the case, or that the standard for issuance of a true bill of indictment is much lower than the burden of proof at trial."

¶38.    This is a clear misrepresentation of the record.  In contrast, what the transcript reveals is that the trial court informed the venire that the grand jury only hears one side of the case, that the defendant was presumed innocent, and that it was the duty of the empaneled jurors to determine guilt or innocence:

> [S]o far this case has been submitted to the grand jury; an indictment was returned. At the grand jury proceeding, **only one side of the case is presented**, **and that's everything from the State's perspective**. There is no witnesses that could be favorable to the defendant that testify. Mr. Chandlee [trial counsel for the defendant] is not able to be there. Mr. Campbell is not able to be there.
>
> **So an indictment does not mean guilty**.  **It does not mean not guilty**. The only person that can determine guilty or not guilty is the jury, and that's what y'all will be here for today. You only determine guilty or not guilty after hearing all the evidence and testimony that's put before you today and tomorrow. And that will come through witnesses that will come up here on the

13

witness stand; that will come from exhibits that may be introduced by – between counsel and the witness. But that's where the guilty and not guilty come into play.

We have, you know, presumption of innocence in our judicial system. **Just because someone is indicted does not mean they are guilty. I just want to make sure that's clear**[.]"

(Emphases added).

¶39. Therefore the record establishes that counsel for Campbell misrepresented what occurred during trial and repeatedly referred to the trial judge as having said things that were simply not said. This misrepresentation does not appear accidental, as this section of Campbell's principal brief is predicated on the unfounded allegations the trial court poisoned the jury against the defendant by its statements. No such event occurred and it was misleading to present such an argument.

¶40. Counsel is reminded that a "lawyer shall not knowingly . . . make a false statement of material fact or law to a tribunal" and, furthermore, shall not "fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel[.]" Miss. R. Prof. Conduct 3.3(a)(1), (3).

¶41. As set out above, precedent allows the trial court to read the indictment or convey its contents to the venire, and the record reveals no reversible error in the conduct of the trial court. Even a cursory review of the transcript establishes the trial court carefully pointed out to the venire the presumption of innocence and that an indictment was only one side of the story. There is no error.

14

**III.    There was no *Brady* violation regarding the lost fingerprints.**

¶42.    Campbell also argues that the State committed a *Brady*[1] violation by losing evidence, specifically by "failing to preserve and produce the fingerprints at issue," referring to the evidence lifted at the crime scene.  He contends this lost evidence warrants a reversal.

¶43.    Precedent holds "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Mohamed v. State*, 323 So. 3d 532, 550 (¶55) (Miss. Ct. App. 2021) (internal quotation marks omitted). To establish such a violation, a defendant "must meet all four prongs" of a test set by our Supreme Court:

> The defendant must prove: (a) that the State possessed evidence favorable to the defendant (including impeachment evidence); (b) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (c) that the prosecution suppressed the favorable evidence; and (d) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*Id.* (citing *Manning v. State*, 929 So. 2d 885, 891 (¶15) (Miss. 2006)).

¶44.    In this case, there is no proof the State ever possessed any evidence favorable to the defendant.  The transcript from the trial court establishes that fingerprints were taken at the home Campbell burglarized.  Nothing in the record suggests the fingerprints belonged to anyone other than Campbell.  Indeed, Officer McDonald testified that after placing Campbell under arrest, another officer at the scene "pulled the remote out of [Campbell's] pocket." Ms. Thrailkill confirmed the remote recovered from Campbell's pocket belonged to the TV

---

[1] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

15

that was stolen from her house. There was no evidence that the prosecution suppressed any evidence, let alone evidence that was favorable to Campbell. We find no merit to this assignment of error.

¶45. And although Campbell casts his argument as a violation of *Brady*, he relies heavily on a series of cases that are not about intentional withholding of evidence, but rather accidental or negligent loss of information by the State. "The standard that developed . . . is that the evidence in question must meet the two-part test . . . that (1) evidence must possess an exculpatory value that was apparent before the evidence was destroyed, and (2) be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *State v. McGrone*, 798 So. 2d 519, 522 (¶8) (Miss. 2001). "In addition, "the prosecution's destruction of evidence must not have been in bad faith." *Id.* (internal quotation mark omitted).

¶46. Just as above, nothing in the record reveals the fingerprints collected at the scene had any exculpatory value at all for Campbell. Instead, it appears the fingerprints were not actually tested by the crime lab. As the State points out, Campbell only argues the information was "important and *potentially* exonerative." But that is not the standard—our precedent requires proof that the lost or damaged evidence had exculpatory value apparent prior to the loss. Because Campbell cannot point to any part of the record that establishes the collected fingerprints had any exculpatory value, we find no error.

### IV. The trial court did not err in overruling the *Batson* challenge.

¶47. Finally, Campbell argues the trial court erred in overruling his *Batson* challenge

during jury selection.

¶48. "[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race[.]" *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). "When addressing a *Batson* challenge, a trial court employs a three-step procedure:

> (1) the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose; (2) once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible, race-neutral justifications for the strikes; and (3) if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination."

*Pruitt v. State*, 986 So. 2d 940, 942-43 (¶8) (Miss. 2008) (citing *Johnson v. California*, 545 U.S. 162, 168 (2005)).

¶49. We review "'a trial court's ruling on a *Batson* challenge with great deference and will not overturn the trial court's ruling unless it is clearly erroneous or against the overwhelming weight of the evidence.'" *Jones v. State*, 252 So. 3d 574, 580 (¶25) (Miss. 2018) (quoting *Pruitt*, 986 So. 2d at 942 (¶8)).

¶50. We first note that Campbell did not raise his *Batson* challenge before the trial court until *after* the jury and alternates were seated. *See* MRCrP 18.4(e) ("Constitutional challenges to the use of peremptory challenges shall be made *at the time* each panel is tendered") (emphasis added)); *see Keller v. State*, 138 So. 3d 817, 842 (¶43) (Miss. 2014) (recognizing "a procedural bar on appeal where the defense has failed timely to object to the State's peremptory challenges to venire members"); *Myers v. State*, 565 So. 2d 554, 557 (Miss. 1990) (holding "a party who fails to object to the jury's composition before it is

empaneled waives any right to complain thereafter"). Therefore, because Campbell was required to raise his *Batson* challenge immediately after the State exercised its peremptory strikes and failed to do so, this claim is procedurally barred.

¶51. Notwithstanding the bar, Campbell's *Batson* claim cannot succeed because he failed to establish a prima facie showing that the State's peremptory challenges were based solely on race. During jury selection, counsel for Campbell argued that "every black juror [had] been struck off the jury" and that there were "no people of color selected at all." In response, the State then went through each of its strikes and offered a race-neutral purpose for striking each of the jurors. Then, rather than rebutting the State's race-neutral reasons as a pretext for discrimination, Campbell's trial counsel seemingly interrupted the trial court and requested that the trial court give "just a ruling," stating, "[W]e have no response to that." Because Campbell failed to rebut the State's race-neutral reasons for striking the jurors, his argument is waived on appeal.

¶52. Accordingly, Campbell's argument that "any errors or omissions in the *Batson* challenge process are properly attributable to the trial court" lacks merit, as "'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" *Pruitt*, 986 So. 2d at 947 (¶22) (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)). Therefore, we find the trial court's *Batson* rulings were not clearly erroneous or against the overwhelming weight of the evidence.

## CONCLUSION

¶53. For the reasons set out above, we find the overwhelming weight of the evidence was

18

not against the jury's verdict, and there was sufficient evidence for a rational jury to find that Campbell committed each element of the crime of burglary of a dwelling. We also find no error in the trial court's reference to the grand jury proceedings. Further, we find no *Brady* violation with respect to the allegedly lost fingerprints since Campbell failed to establish that they possessed any exculpatory value. Finally, procedural bar aside, we find the trial court did not err in overruling Campbell's *Batson* challenge. Therefore, we affirm his conviction and sentence.

¶54. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE AND EMFINGER, JJ., CONCUR. SMITH, J., NOT PARTICIPATING.**